## RICHTER v. HOGLUND et al.

## SAME v. FARMERS MUTUAL AUTOMOBILE INS. CO. et al.

### No. 8104, 8107.

Circuit Court of Appeals, Seventh Circuit.

Jan. 20, 1943.

---

[2] 38 U.S.C.A. §§ 426, 445, 445c.

Fred W. Genrich, Jr., and Herbert L. Terwilliger, both of Wausau, Wis., for appellant.

A. J. O'Melia, of Rhinelander, Wis., Charles F. Smith and Richard P. Tinkham, Jr., both of Wausau, Wis., and Gerald P. Hayes and John A. Kluwin, both of Milwaukee, Wis., for appellees.

Before SPARKS, KERNER, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

George Richter, the plaintiff-appellee, sued Lawrence Paul and his insurance carrier, the United States Fidelity & Guaranty Company, and Elvera Hoglund and her insurance carrier, the Farmers Mutual Automobile Insurance Company, to recover

for personal injuries he received when Paul's car, in which Richter was riding as a guest, collided with Miss Hoglund's car, driven by herself. Paul in turn filed a counterclaim for personal injuries and property damage against Miss Hoglund and her insurance carrier, and she in turn filed a counterclaim against Paul and his insurance carrier for personal injuries and property damage.

The accident happened near Tomahawk, Wisconsin, and the actions were tried before a jury in the Western District of Wisconsin. Under the comparative negligence statute of Wisconsin, the jury found the defendant-appellant Hoglund one hundred per cent negligent. Richter recovered a judgment on his complaint against Miss Hoglund and the Farmers Mutual Automobile Insurance Company for $15,379.70. On his counterclaim Paul recovered a verdict against Miss Hoglund of $4,697. After suit was filed but before the trial, the United States Fidelity & Guaranty Company took from Richter a partial release in the nature of a covenant not to sue, in consideration of the payment of $2,750. Nothing was said in the pleadings or on the trial about this transaction, and the release is printed in the record here without having been considered below at all. The court reduced the verdict of Richter to .$11,500, and that of Paul to $4,000, and entered judgment on the verdicts. From this judgment, Miss Hoglund and the Farmers Mutual Automobile Insurance Company appeal.

These facts appear from substantial evidence in the record. About ten o'clock on the evening of May 23, 1940, Lawrence Paul was driving northward on State Highway 51. Elvera Hoglund was driving south along the same road. She was alone, while Richter was a guest in the Paul car and was asleep at the time of the accident. As Paul came around a curve in the road, driving at a speed between forty and fifty miles per hour, he saw Miss Hoglund's car coming south at a distance of two hundred to three hundred feet. She was driving at a speed between thirty and thirty-five miles per hour. The cars approached on their respective sides of the road until almost opposite each other, when one of the cars got over the center line of the road and on the other car's side of the road, and a collision resulted.

Paul testified Miss Hoglund's car came over on his side of the road, and Miss Hog-lund testified Paul drove his car over on her side of the road. A disinterested witness, William Yeschek, visited the scene of the accident the night it happened and saw the skid marks of Paul's car clearly on the east side of the center line as he traveled north to the point of the collision. At the point of the collision, there was much debris on the east side of the road, and there were deep cuts in the blacktop pavement where the wrecked car of Paul had veered off the east side of the road, turned over twice and landed in a ditch, headed west. The Hoglund car was across the highway, partly on the east lane and headed almost east. The left front of the Hoglund car had hit the left front wheel and fender of the Paul car. After the accident, Paul asked Miss Hoglund: "* * * what happened, she come across the road the way she did. She told me that she had been fixing a window on the other side of the road, or down the road, and had swung across that way." Miss Hoglund admitted the window was stuck and she had been trying to close it without success, but stated she had stopped down the road before the accident for that purpose, and she denied that she was trying to fix the window while the car was in motion.

Miss Hoglund was a trained nurse employed in the private hospital of Dr. Henderson at Tomahawk. She directed the injured Richter and Paul to this hospital, where Dr. Henderson treated them. A traffic officer accompanied the parties to the hospital, and requested that a specimen of the urine of Paul and of Richter be taken and sent to the State Toxicologist for analysis to determine whether the parties were intoxicated. Richter and Paul both testified that they were not intoxicated at the time of the accident. Paul admitted that he had had three or four one-ounce glasses, not quite full, of whiskey the forenoon of the day of the accident. Paul met Richter about one-thirty p. m. of the day of the accident, and they drove to Merrill, some sixty miles, where they met Paul's mother and assisted her with some business transactions. In the middle of the afternoon, while in Merrill, Richter and Paul each drank a bottle of beer. Paul testified that the drinks he had in the morning and the bottle of beer in the afternoon were all the alcoholic beverages he had that day. Richter testified that the bottle of beer was the only alcoholic beverage he had that day. They drove from Merrill to visit a nearby dam, and on to Tomahawk. Rich-

ter, who was afflicted with asthma and who had been unable to sleep during the two nights preceding the accident, fell asleep. Paul stopped in Tomahawk for a lunch. Paul then proceeded on from Tomahawk to the scene of the accident, about eleven and one-half miles away.

Paul's employer saw him just before noon, and testified that Paul was sober at that time. Paul's mother saw him just before his departure for Merrill about six p. m., and she testified he was sober at that time. The restaurant keeper at Tomahawk knew Paul and remembered that he was in his restaurant around nine p. m., and he testified that Paul was sober then and that he had no drinks there. Dr. Henderson, who treated Paul and Richter after the accident, said he could detect no odor of liquor about either of them.

In order to prove that Paul and Richter were intoxicated, the appellant Hoglund offered Dr. Henderson to prove the taking of the urine specimens. The appellees objected that Dr. Henderson was the physician of Richter and Paul and the matter was privileged, and that Dr. Henderson had no right to take specimens of his patients' urine and send them to the State Toxicologist. Dr. Henderson was extensively cross-examined and the court manifested considerable concern about the right of Dr. Henderson to take and send the urine specimens, and whether or not he had the consent of his patients to do so. The court finally permitted Dr. Henderson to testify as to the taking of the urine specimens, and their transmittal to the State Toxicologist, and permitted the State Toxicologist, Dr. Kozelka, to testify as to the alcoholic content of the urine and what the presence of this content indicated as to intoxication. The evidence showed that the urine specimens were taken at nine-thirty the morning following the accident. Dr. Kozelka testified the specimen purporting to be that of Paul indicated that he was under the influence of intoxicating liquor, but the specimen of Richter indicated an insignificant amount of alcohol.

The appellants complain that the value of this testimony was destroyed by the court's questions and observations and the vigorous cross-examination of Dr. Henderson. We have carefully read all of the record with reference to Dr. Henderson's examination, and we cannot agree with the appellants that the court's conduct or the cross-examination was prejudicial to the appellants. The concern of the court and of counsel for the appellees Richter and Paul can well be understood. The court had to determine whether or not this evidence was properly obtained and admissible. Dr. Henderson was the appellees' doctor and was treating the appellees as his patients at the time he was taking their urine specimens and turning them over to third parties. It must also be borne in mind that the appellees were patients in a small private hospital where Miss Hoglund was employed and presumed to be on very friendly terms with her fellow-nurses and her employer, Dr. Henderson. Therefore, it was not unusual for the appellees' counsel to be somewhat suspicious and vitally interested in ascertaining whether the specimens were properly taken. See Kuroske v. Ætna Life Ins. Co., 234 Wis. 394, 403, 291 N.W. 384, 388, 127 A.L.R. 1505.

■■ In determining whether the doctor's acts and revelations of things learned and his use of the specimens obtained from his patients while in his care and under treatment were within or without the privilege of Sec. 325.21 of the Wisconsin statutes, the court had a broad discretion as to the extent of the cross-examination of the doctor, and the right of the judge himself to participate therein. In the case at bar, this discretion was not abused. Before the appellants can claim prejudice of their case in the preliminary examination to determine the admissibility of evidence that is finally admitted, they would have to show very extensive and gross abuse of discretion in such preliminaries. We are quite satisfied that such abuse is not present in the instant case.

Furthermore, it is difficult for us to see how a vigorous cross-examination of Dr. Henderson could be prejudicial, when Dr. Kozelka testified at great length as to the alcoholic content of the specimens of urine, and the court instructed fully on the question of intoxication. The issue on the question of intoxication was fairly submitted to the jury, and it resolved that question in favor of the appellees. We see no reason for disturbing this finding.

■ The appellants next complain that the court erred in refusing to admit in evidence the hospital record of appellee Richter. The appellants never offered the hospital record of Richter. The said record was read in evidence by the nurse Conry while under cross-examination by the

752

attorney for appellee Paul. The attorney for Richter moved to strike all reference to Richter's hospital record except the time the specimen of urine was taken. The court sustained this motion. The appellants never objected to the motion, or to the striking from the record in accordance therewith. The court stated: "The use of that hospital record was simply for the purpose, the Court had in mind, of ascertaining the time when the—"

Mr. Genrich: (Attorney for Appellants—Interrupting.) "I see—all right."

The Court: (Continuing.) "urine was bottled, and it will be used for no other purpose."

No error was committed with reference to this transaction, first because the appellants made no objection to the motion to strike and the granting thereof; and secondly, because the counsel for the appellants not only did not object to the court's action, but acquiesced therein.

The next question presented is whether or not the damages awarded were excessive. Richter sued for $15,000, and recovered a verdict of $15,379.70. The amount in excess of $15,000 was the amount of damages proved for hospital and doctor expenses, etc. The trial court reduced this verdict to $11,500.

■ The evidence showed without dispute that Richter was very seriously injured. He was unconcious until some time the next morning after the accident. He regained consciousness in the hospital. He was strapped to the bed. He had suffered great shock. He was in the hospital for eighteen days. After his discharge therefrom, he did not work any more that summer. He earned fifty dollars a week as a musician when he worked. He suffered a concussion of the brain, and at the time of the trial he suffered some defect to his equilibrium, as demonstrated by the well-known Romberg test. At the time of the trial, he was still suffering from headache, dizziness and backache. He had received three large cuts on his face which left scars, one of which disfigured his left ear; and as the result of one of the other cuts and the injuries he received to his head, there is a complete and permanent loss of muscle control of the left half of the forehead. These muscles are paralyzed. There is an area of hyperesthesia (which means that it is very over sensitive) on the scar in front of the ear. There is a larger area between the eye and the ear in which there is absolutely no sensation. The lumbar region of the back was tender at the time of the trial, and pain was excessive when the thigh was drawn up against the abdomen. His pain and suffering were and are great. Richter was thirty-one years old. With such injuries, suffering, disfigurement, paralysis and the permanency of several of the injuries, we do not think the verdict was excessive.

■ Appellee Paul recovered $4,697. The sum in excess of the $4,000 prayed for in the complaint was damage to his automobile and recompense for doctor and hospital expenses. The court reduced the verdict to $4,000. This verdict is also challenged as excessive.

Paul suffered a head injury, with a cut across his nose and a fracture thereof displacing the septum to the right, causing very serious and almost complete obstruction to breathing through the right nostril. This condition had caused the membranes inside the nose to thicken and interfere with the proper drainage of the sinuses, which caused the plaintiff to suffer severe headaches almost daily, and sometimes they were severe enough to last the entire day. He suffered dizzy spells for a year after the accident. Dr. Brick, who examined him just before the trial, testified that at a cost of $225 an operation could be had upon his nose that would relieve him, but he could not guarantee that the operation would give him complete relief, and that in his opinion there would always be some permanent effects of the injury to the nose. The doctor also testified that there was embedded in the skull of Paul what appeared to be a piece of steel, which should be removed, and that the removal would require an operation that would cost $150. Paul was in the hospital only one day, and his doctor bill and hospital bill amounted to $62. The damage to his car was $635. This would leave less than $3,000 to compensate him for: the injuries to his nose; the pain and suffering occasioned by the accident; the pain and suffering he might have to endure in submitting to two operations to correct injuries he received; the time he lost after the accident, amounting to several days; and any time he might lose from his work due to the operations. While this verdict is substantial for the injuries received, we do not think it is so excessive as to indicate undue prejudice, passion or corruption on the part of the jury. Sweet v. Underwriters' Co., 206

Wis. 447, 240 N.W. 199; Kull v. Advance-Rumely Co., 209 Wis. 565, 245 N.W. 589; McCartie v. Muth, 230 Wis. 604, 284 N.W. 529; Groh v. Krahn, Inc., 223 Wis. 662, 271 N.W. 374; Knaus v. Yoder, 98 Colo. 1, 52 P.2d 1152; Coppock v. Pacific Gas & Electric Co., 137 Cal.App. 80, 30 P.2d 549.

■ It is urged that the court erred in permitting over appellants' objection one Prahl, a traffic officer, to testify as to the presence at the time of the trial of certain skid marks on the east side of the center line, both on the blacktop pavement and on the shoulder, and of a gouged place in the east shoulder of the road, at the point on Road 51 south of Road 8 where the accident was shown by other competent evidence to have happened.

Prahl did not attempt to say what caused the marks, except to say that they were such as a car would make, and he did not attempt to say they were made by Paul's car. Yeschek had testified that the marks made by Paul's car at the time of the accident were still visible on the highway at the point where the accident happened. That location had been clearly established by competent evidence. Yeschek took Prahl out and showed him the place in question, and Prahl came back and testified as to what he saw with reference to the marks on the highway at that particular point. The purpose of this evidence was to corroborate Yeschek that the marks were still on the pavement at the point of the accident, and not to prove by Prahl when the marks were put there or by what means. These facts had already been established by other competent evidence, and the testimony of Prahl was limited by the court and counsel to the corroboration of Yeschek as to the marks on the road at the scene of the accident at the time of the trial. When so limited it was admissible, and the weight to be given thereto was for the jury.

■ ■ Finally, the appellants contend that the amount of the Richter verdict should be further reduced by the amount of the payment received from the United States Fidelity & Guaranty Company in consideration of the covenant not to sue. No question was presented to the court below concerning this matter. It is raised for the first time on this appeal. Matters raised here for the first time which should have been considered in the court below will not be considered by us. Springer v.

United States, 102 U.S. 586, 26 L.Ed. 253; Towle v. Pullen, 7 Cir., 238 F. 107. If the appellants are entitled to a remittitur on the judgment rendered against them, the District Court is the place to present that claim.

The judgment is affirmed.