LUEHRMANN et al. v. DRAINAGE DIST. NO. 7 OF POINSETT COUNTY, ARK.

BRADSHER v. SAME.

HAVERSTICK v. SAME.

Nos. 11372–11374.

Circuit Court of Appeals, Eighth Circuit.

June 13, 1939.

Rehearing Denied July 24, 1939.

698

Norman C. Parker, of St. Louis, Mo., and J. B. Daggett, of Marianna, Ark., (Daggett & Daggett, of Marianna, Ark., and Rassieur, Long & Yawitz and Charles D. Long, all of St. Louis, Mo., on the brief), for appellants George E. W. Luehrmann, et al.

C. T. Carpenter, of Marked Tree, Ark., for appellants Fred Bradsher and J. G. Haverstick.

Charles D. Frierson, of Jonesboro, Ark., for appellee.

Before SANBORN, THOMAS, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

September 15, 1937, Drainage District No. 7 of Poinsett County, Arkansas, filed a debt composition proceeding pursuant to the provisions of the Act of August 16, 1937 (50 Stat. 654, 11 U.S.C.A. §§ 401–404) entitled "Composition of Indebtedness of Local Taxing Agencies". By Section 403 it is provided that any qualified petitioner may file a petition under the Act, stating that the petitioner is insolvent or unable to meet its debts as they mature, and that it desires to effect a plan for the composition of its debts. It is further provided that any creditor of the petitioner affected by the plan may file an answer to the petition, controverting any of the material allegations therein, and setting up any objection he may have to the plan of composition. If the material allegations are sustained the creditors shall be classified according to the nature of their respective claims and interests, provided: "That the holders of all claims, regardless of the manner in which they are evidenced, which are payable without preference out of funds derived from the same source or sources or shall be of one class. The holders claims for the payment of which specific property or revenues are pledged, or which are otherwise given preference as provided by law, shall accordingly constitute a separate class or classes of creditors."

A former Act (May 24, 1934, 11 U.S. C.A. §§ 301–303) permitting municipal corporations and other political subdivisions of states, unable to pay their debts as they mature, to resort to the federal courts of bankruptcy to effect readjustment of obligations, was before the Supreme Court in Ashton v. Cameron County Water Improvement District No. 1, 298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309. It was there held that the power claimed in support of the Act, as applied to the district organized to permit water for irrigation and domestic purposes, having power to sue and be sued, issue bonds, and levy and collect taxes, was unconstitutional, as restricting the states in the control of their fiscal affairs. The appellant district there was held to be a political subdivision of the state.

The Act of August 16, 1937, under which this proceeding was brought, undertakes to meet the constitutional weakness of the former Act by the following provision: "That if any provision of this chapter, or the application thereof to any such taxing agency or district or class thereof or to any circumstance, is held invalid, the remainder of the chapter, or the application of such provision to any other or different taxing agency or district or class thereof or to any other or different circumstances, shall not be affected by such holding." 11 U.S.C.A. § 401.

In Drainage District No. 2 of Crittenden County, Arkansas v. Mercantile-Commerce Bank & Trust Company, 8 Cir., 69 F.2d 138, this court held that an Arkansas Drainage District is not a governmental agency as respects the question of whether the district is subject to equity jurisdiction. This ruling is based upon the decisions of the Supreme Court of Arkansas holding that drainage districts are quasi-public corporations which are not political or civil divisions of the state like counties and municipal corporations created to aid in the general administration of the government. They are not created for political purposes, nor for the administration of the government. Appellants do not contend that the petitioner falls within the limitation upon the power springing from this amendment to the Bankruptcy Act, which limitation was declared in the Ashton case.

These three appeals were heard together upon the same transcript and the several appellants have specified different

grounds upon which each relies for reversal of the decree which holds the proposed plan of composition fair, equitable and just, and in full compliance with the provisions of the Act under which it is offered, and authorizes the district, upon confirmation of the plan, to take all action necessary to carry out the terms thereof.

Before taking up the objections of appellants it is deemed best to outline very generally the nature of the proposed plan and the circumstances and conditions under which it was initiated. As a result of excessive floods in 1927, the district defaulted on its outstanding bonds in August of that year. A Bondholders Protective Committee was formed September 2, 1930, with which more than two-thirds in amount of the bonds co-operated. When the Reconstruction Finance Corporation was given authority to grant loans to such drainage districts to readjust their finances, this Bondholders Committee applied for such a loan. January 4, 1934, the Reconstruction Finance Corporation offered to the district a loan computed upon the basis of 25.879 cents on the dollar of principal indebtedness outstanding. At the time this offer was accepted by the committee the bonds under its control amounted only to 95% of the total issue. Also two judgment creditors refused to co-operate. For this reason, the Reconstruction Finance Corporation stipulated that the entire issue of bonds outstanding should not be cancelled, but should be held as security for the repayment of the loan to be made, which was intended to reduce the indebtedness, but only under conditions of safety to the lender. No money was paid out under this loan until July 3, 1934. Meantime, May 24, 1934, Congress passed the first readjustment or composition Act, afterwards held unconstitutional in the Ashton case. It is evident that the Reconstruction Finance Corporation, in the disposition of the funds loaned, acted in reliance upon the terms of that Act. It disbursed funds amounting to 25.879 cents upon each dollar of principal indebtedness held by the Bondholders Committee, which then amounted to 98.2% of bonds aggregating $5,659,887.50 in principal when the petition was filed, and to 88.5% of judgments and other indebtedness aggregating $154,493. Under the readjustment plan all the bonds controlled by the Committee of Bondholders were transferred to one Louis Ritter, Trustee, to be held until the plan of readjustment should be finally effected. Ritter was succeeded by W. B. Chapman as such trustee. When the Act of August 16, 1937, became a law, the district filed the present petition for composition. Chapman, holding as trustee 98.2% of such bonds, filed acceptance of the plan, as did 85.5% of all judgment creditors, and it is therefore claimed by appellee that more than two-thirds of the aggregate amount of all classes affected by the plan, excluding any owned, held or controlled by the petitioner, have accepted the plan in writing. With these preliminary statements it is felt that a more complete grasp of the situation may be gained by a consideration of the objections urged by appellants to the proposed plan of composition. Those relied upon in the Luehrmann appeal are:

1. District No. 7 is both solvent and able to meet its debts as they mature, because its assets exceed its actual indebtedness of approximately $1,750,000, and because its annual income is far greater than the cost of carrying this indebtedness.

2. The bondholders who have already scaled their debts before this petition was filed cannot be counted as preliminary acceptors of the plan, nor as part of the two-thirds ultimately necessary to the confirmation of the plan.

3. The plan to pay all bondholders 25.879 cents on the dollar is unfair and inequitable to non-assenting bondholders, because compelling them to relinquish their liens without compensation. Also it does not give certain bonds precedence according to dates, and proposes to repay the Reconstruction Finance Corporation dollar for dollar on its loan of January 1, 1934.

4. Bonds issued by the drainage district in 1918 are entitled to a lien prior to that of subsequent issues, because based upon a prior complete plan of drainage improvement.

Appellant Bradsher presents the single objection that the district is now solvent, and therefore cannot avail itself of the provisions of the Composition Act under which it is undertaking to proceed.

Appellant Haverstick, a judgment creditor, assigns and argues five points: (a) District No. 7 is solvent; (b) the plan has not been accepted by creditors holding two-thirds of the aggregate amount of claims; (c) the plan is neither fair nor equitable

and discriminates unfairly against appellants; (d) appellant's judgment constitutes a first and paramount lien on all revenues and resources of the district and is entitled to immediate payment in full; (e) the lien of this judgment is not dissolved or affected by bankruptcy proceedings.

The contention that the district is solvent, and therefore ineligible to relief under this Act, is common to all objectors, and upon it greatest stress was placed at the hearing. Appellants concede that the indebtedness of the district is at least $1,750,000; and the secretary of the district testifies that, at the time the petition was filed, it amounted to $1,784,750, "Assuming now that the bonds come in and take up the entire loan". He says further that "the old outstanding bonds, as well as the judgments purchased from the Cross County claimants are being held by the Federal Reserve Bank in Cleveland, as collateral to the trustee notes". (Given for the proposed loan and advancements by the Reconstruction Finance Corporation.) The total principal bond issue outstanding at the time of refunding was $5,659,887.50. This was the finding of the district court, which found further that, with accrued interest, the bonded debt, at the time the petition was filed, amounted to $6,814,677.48; and, in addition thereto, that the petitioner owed notes to the Reconstruction Finance Corporation in the sum of $210,000, with interest, and owed judgments and other debts amounting to $154,493. In this connection the trial court made the following findings:

"The assets of the district or the assessment of benefits against real estate total $5,055,445.32 assessed against a total of 149,157.57 acres of land, of which assessed benefits the total sum of $696,024.98, assessed against 87,667.93 acres of land, is delinquent.

"The district has brought annual, foreclosure proceedings upon delinquent assessments, but the sole effect is that the land is stricken off to the district at the foreclosure sale and for some years no cash is realized at said sale.

"When the lands become delinquent for drainage taxes they also generally become delinquent for State and County Taxes and for taxes to St. Francis Levee District, which latter overlaps the entire territory of petitioner. Hence there are three tax titles outstanding against such forfeited lands, one to the drainage district, one to the Levee district, and one to the State of Arkansas. Such titles are not readily marketable and under present conditions there is no active market for real estate in the district, no matter with what title. Hence the drainage district is unable to turn into cash the forfeited lands except in rare instances and for small sums.

"Under all these facts the insolvency of the district is evident and manifest".

 It is manifest that, if the bonded indebtedness above stated is still outstanding, and unsatisfied, the district is insolvent as claimed by the petitioner.

At the outset the Reconstruction Finance Corporation undertook to make a refunding loan to the district upon the application of the bonding committee which procured the acceptance of a large percentage of bondholders, evidenced by the deposit of their bonds. About 98.2% of the bonds were ultimately so deposited, but there were about $100,000 worth still outstanding and not expressly assenting, and also judgments and other debts aggregating $154,493. Of course the Reconstruction Finance Corporation was not authorized to make a loan subordinate to prior outstanding liens, nor did it undertake to do so. In order to preserve its rights the bonds controlled by the bondholders' committee were transferred to the trustee Ritter, who was succeeded by Chapman, so to be held until the transaction could be closed with safety to the Reconstruction Finance Corporation. Meantime the Readjustment Act of May 24, 1934, 11 U.S.C.A. §§ 301–303, became operative before any disbursements had been made and all future transactions between the Reconstruction Finance Corporation and the district were based upon an acceptance of the application of that Act to the financial needs of the district. Accordingly disbursements were made upon the basis of 25.879 cents on the dollar to all accepting bondholders, but the bonds were still retained as collateral security in the hands of the trustee. This was the situation when the Act of 1934 was declared invalid.

Upon passage of the Composition Act of 1937, the petition of the district was renewed and the present proceedings in composition were instituted. The trustee Chapman, acting for the bondholders who had accepted the original offer, filed acceptance of the proposed plan; 88.5% of

judgment and other creditors did likewise; all such, in view of the expected composition settlement, received the same amount of 25.879 cents on the dollar of their claims. No bonds in the hands of the trustee have been cancelled. They are still outstanding obligations of the district unless and until they are finally liquidated by satisfaction of the obligations to the Reconstruction Finance Corporation, sought to be effected through the proceeding in composition now before us. In this view the quoted finding of the trial court upon this phase of the controversy has substantial support in the record.

■ The objection that the bondholders (and, incidentally the judgment creditors) have scaled their debts by accepting 25.879 cents on the dollar in settlement of their claims, and therefore cannot be counted as acceptors of the debt readjustment plan, is very closely connected with the question of the solvency or insolvency of the district. Undoubtedly, if the Reconstruction Finance Corporation loan had been conducted as an entirely disconnected transaction, and the disbursements to the creditors of 25.879 cents on the dollar had been made as unconditional purchases of the claims, both of these objections would have been entitled to weight. But it is apparent from the record and from the findings of the court that the readjustment loan made by the Reconstruction Finance Corporation must be considered in connection with the two applications for readjustment and composition in bankruptcy under the Acts of 1934 and 1937. No disbursements were made by the Reconstruction Finance Corporation until the initial steps had been taken by the district under the first of these Acts, and it is apparent that all parties to the transaction acted upon the understanding that the disbursements made were in conformity with the plan of readjustment then in process under the first Act, and later continued in substance under the second Act. For this reason we think these classes of bondholders and judgment creditors so far retained their original status as entitled them to be counted as acceptors of this composition plan.

■ The objection to the proposal to repay the Reconstruction Finance Corporation in full upon the outlet loan of January 1, 1934, does not impress us favorably. This was an emergency loan of $235,000.00, of which $210,000 are still outstanding. The governmental agency would not have loaned the money except upon a promise of repayment in full. This statement is amply supported by the record. The Bondholders Protective Committee, holding at that time legal title to at least ninety per cent of the district's bonds, recommended the district's application for this emergency loan to hasten completion of a new outlet for flood protection. It was thus an absolutely necessary improvement, recognized by district and bondholders, and this recognition is in harmony with the terms of the debt composition Act.

■ A further objection is that the plan is unfair because it does not give the holders of a certain bond issue, that of January 1, 1918, the prior lien to which it is alleged to be entitled as against subsequent issues. The issue of January 1, 1918, was for $1,400,000. There were later issues in 1919, 1923, 1924, and 1926. The trial court found that all these bonds are upon equality regardless of their date. The grounds upon which this finding is based are thus stated:

"53. The Court finds that all of the bonds of the district were issued to obtain funds for the levees, ditches and other improvements of the St. Francis and Little River Basin within the district. That by the petition of landowners and later by legislative approval the plan of improvement of the original district was made greater by addition of territory.

"54. That in the first contract for the sale of bonds it was contemplated that additional bonds would be required to complete the work. That two successive Bondholders Committees acted in co-operation with the district, one created in 1927 and the other in 1930 and that both said Committees at all times dealt with the bondholders as being on a parity regardless of date and construed the law to be that all bonds were equal regardless of date.

"55. That no bondholder ever raised the question of priority either with the district or with either of the Bondholders Protective Committees until the interventions filed in this proceeding. That in the issuance of refunding bonds in 1927 that Committee treated all bonds as being on a parity and no bondholder then objected.

"56. The Committee created on September 2, 1930, treated all bonds as equal regardless of date when said Committee

participated in obtaining a loan from Reconstruction Finance Corporation for about $250,000.00 to complete a new outlet for the district, and said Committee surrendered coupons so as not to increase the total debt of the district to the amount of $250,000.00 without any regard to the question of priority by date.

"57. The court finds Geo. E. W. Luehrmann, Alfred D. Luehrmann and Edward H. Luehrmann, having deposited their bonds with the Bondholders' Protective Committee, are estopped to claim priority or otherwise attack the plan because of the previously quoted terms of the agreement under which the Bondholders' Protective Committee had the right to agree to the debt readjustment plan and to transfer the bonds in accordance therewith; and the said Bondholders' Committee did so agree and said bonds are held now as collateral to the note of Louis V. Ritter, Trustee, and are voted in favor of the debt readjustment plan such vote binding the said Geo. E. W. Luehrmann, Alfred D. Luehrmann and Edward H. Luehrmann.

"58. That all holders of bonds of the earlier issues are barred and estopped by their acquiescence in the treatment of all said bonds as being upon a parity without objection, and furthermore are barred and bound by the fact that a majority of holders of the bonds of the first issue and of the second issue and of every issue have approved the debt readjustment plan, such majority aggregating much more than the required 66⅔% necessary to put the plan into force."

"60. The court further finds that a majority of about 97.7% of the outstanding bonds of the district have consented in writing to the acceptance of the debt readjustment plan and that such acceptance is binding upon the minority of said bondholders as a class."

These findings we think bring the case on this point within the decision of this court in Rowekamp v. Mercantile-Commerce Bank & Trust Co., 8 Cir., 72 F.2d 852, 857, in which it was held that Acts authorizing successive bond issues and placing them on a parity did not impair the obligations of contract "because the original bondholders contracted with knowledge or constructive notice that subsequent issues might so issue, and, as has been observed, every act authorizing a new issue provided additional taxes to compensate for the added burden".

In the instant case it is apparent that there was constructive notice that subsequent issues might so issue. All the bonds of the district were issued to obtain funds for a common purpose—for the levees, ditches and other improvements to protect the district from floods, and to provide necessary outlets; the plan of improvement, with legislative approval, was later made greater by the addition of territory, providing the basis of additional revenues to compensate for the added burden. The court finds that, in the original contract for the sale of bonds, it was contemplated that additional bonds would be required to complete the work. In addition it is found that the holders of bonds of all issues have acquiesced in the treatment of all said bonds as being upon a parity. See also, Howe v. Long Prairie Levee District, 187 Ark. 725, 62 S.W.2d 10, and compare Drainage District 7 v. Exchange Trust Co., 175 Ark. 934, 2 S.W.2d 32, and Exchange Trust Co. v. Drainage District No. 7, 278 U.S. 421, 425, 49 S.Ct. 181, 73 L.Ed. 436.

■ The next and final specification of objection in the Luehrmann appeal is that the plan to pay all bondholders 25.879 cents on the dollar "discriminates unfairly against non-assenting bondholders because it would compel these appellants, as holders of liens, to relinquish these liens to the petitioners without just compensation". This involves a consideration of the nature and effect of composition proceedings under the provisions of the Bankruptcy Act. In support of this contention appellant relies strongly upon the holding of the Supreme Court in Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S. Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106, that the bankruptcy power is subject to the Fifth Amendment, U.S.C.A.Const., and that private property shall not be taken even for a wholly public use without just compensation. But in this opinion (295 U.S. loc. cit. 585, 586, 55 S.Ct. loc. cit. 861, 79 L.Ed. 1593, 97 A.L.R. 1106) some very pertinent and distinguishing language concerning compositions is used: "So far as concerns dissenting creditors, the composition is a method of adjusting among creditors rights in property in which all are interested. In ordering the adjustment, the bankruptcy court exercises a power similar to that long exercised by

courts of law. [Citing cases.] It is the same power which a court of equity exercises when it compels dissenting creditors, in effect, to submit to a plan of reorganization approved by it as beneficial and assented to by the requisite majority of the creditors. [Citing cases.] In no case of composition is a secured claim affected except when the holder is a member of a class; and then only when the composition is desired by the requisite majority and is approved by the court. Never, so far as appears, has any composition affected a secured claim held by a single creditor. Compositions are comparable to the voluntary adjustment with the mortgagee provided for in paragraph 3 of the Frazier-Lemke amendment (11 U.S.C.A. § 203(s) (3). They are not analogous to the so-called adjustment compelled by paragraph 7, (11 U.S.C.A. § 203(s)(7)."

This view of compositions is foreshadowed by the opinion of the same court in Continental Illinois Nat. Bank v. Chicago, Rock Island & P. Railway Company, 294 U.S. 648, 673, 674, 55 S.Ct. 595, 605, 79 L.Ed. 1110, construing and upholding Section 77 of the Bankruptcy Act, added by the Act of March 3, 1933, 11 U.S.C.A. § 205: "The confirmation and legalization of 'a scheme of arrangement' under such circumstances is no more than is done in bankruptcy when a 'composition' agreement with the bankrupt debtor, if assented to by the required majority of creditors, is made binding on the non-assenting minority. In no just sense do such governmental regulations deprive a person of his property without due process of law. * * Every member of a political community must necessarily part with some of the rights which, as an individual, not affected by his relation to others, he might have retained". Compare Kansas City Terminal Railway Co. v. Central Union Trust Co., 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028; Head v. Amoskeag Manufacturing Co., 113 U.S. 9, 21, 5 S.Ct. 441, 28 L.Ed. 889; Horn v. Ross Island Sand & Gravel Co., 9 Cir., 88 F.2d 64, 66, and In re 333 North Michigan Avenue Building Corporation, 7 Cir., 84 F.2d 936, 940. See also, In re Los Angeles Lumber Products Company, Ltd., D.C., 24 F.Supp. 501, affirmed by the Circuit Court of Appeals for the Ninth Circuit, 100 F.2d 963.

■ Appellant Haverstick has a judgment against the appellee district which he insists is a first lien upon the resources and revenues of the district and is entitled to payment in full. The district court found against his contention. It is conceded that this appellant has a valid judgment which is not "dissolved or affected by bankruptcy proceedings"; but the record discloses no priority over other judgments, more than eighty-five per cent of which have assented to and accepted the composition plan. This appellant will receive consideration equal to that accorded to other creditors of the same class.

Appellant Bradsher has an unliquidated claim for alleged overflow damage. This claim has been disallowed by master and district court. His single specification of objection, that the district was solvent when its petition was filed has already been adversely decided.

■ We have sought carefully to consider all possible features of the objections and exceptions interposed and submitted in these three appeals. The record presented, while extended, is admittedly not complete; however, we think it sufficiently supports the findings and conclusions of the trial court. In our judgment there is presented here an application for composition under the Act of August 16, 1937, and it conclusively appears that the loan by the Reconstruction Finance Corporation was, from its inception, a feature of a proceeding in financial readjustment and composition. It appears further that unless and until that composition is effected, the district is hopelessly insolvent, and that the Act of August 16, 1937, is valid as applied to this drainage district, which is not a governmental agency. The amount of 25.879 cents on the dollar to be paid on outstanding indebtedness is found, and appears to be, fair and equitable, and "all that could reasonably be expected under all the existing circumstances". It appears that some of these bonds had theretofore sold for as little as five cents on the dollar. An overwhelming statutory majority of creditors of all classes have accepted the plan, and, in our judgment, the decree of the district court approving it was right and should be affirmed. It is so ordered.